**Frank Daniel WILLIAMS, Appellant,**

v.

**Robert F. ZAHRADNICK and the Attorney General of the State of Virginia, Appellees.**

**No. 79–6210.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 5, 1979.

Decided Oct. 2, 1980.

MURNAGHAN, Circuit Judge:

## I

On June 30, 1975, an armed man attempted unsuccessfully to perpetrate a robbery on Beverly D. Bell, Sr., a Safeway Store security guard in Henrico County, Virginia. The security guard was wounded in the encounter. Frank Daniel Williams, the appellant, was arrested for and convicted of attempted robbery [1] and of malicious wounding [2] by the Circuit Court of Henrico County. He received two concurrent 20–year sentences.

After an unsuccessful appeal to the Virginia Supreme Court, appellant filed, in the United States District Court for the Eastern District of Virginia, a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The petition was denied. Appellant contends here, as in the district court, that the state's references at the trial to his postarrest silence were used unconstitutionally to impeach his alibi defense. The state argues that, pursuant to the doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), habeas corpus review of that issue is precluded by the Virginia Supreme Court's affirmance, allegedly premised on Virginia's contemporaneous objection rule. The state further contends that, should we decide to address the constitutionality of the reference to the postarrest silence, if there was error, it was harmless.

Carter Glass, IV, Richmond, Va. (Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellant.

Alexander Conlyn, Asst. Atty. Gen., Richmond, Va. (Marshall Coleman, Atty. Gen., of Virginia, Robert H. Herring, Jr., Asst. Atty. Gen., Richmond, Va., on brief), for appellees.

Before BUTZNER, RUSSELL and MURNAGHAN, Circuit Judges.

## II

The trial took place in the Circuit Court for Henrico County, Virginia in January 1976. The events surrounding the crimes were recounted at trial by the victim, Beverly D. Bell, Sr. He left the Safeway store at approximately 10:15 p. m. to make a $16,000 night deposit for his employer. As he proceeded across the well–lit parking lot towards his car, he casually noticed a man sitting in a 1962 Chevrolet, one car away from his vehicle. Just as he began to un-

1. Va. Code §§ 18.1–16, 18.1–91 (1960) *repealed by* 1975 Va. Acts, ch. 14, 15.

2. Va. Code §§ 18.1–17, 18.1–65 (1960) *repealed by* 1975 Va. Acts, ch. 14, 15.

lock his car, he heard a voice say, "Hold it right there." Bell quickly looked up and saw a Black man pointing a shotgun at him. Instinctively, he reached for his gun but before he could shoot, the assailant fired, wounding him in the head. A brief exchange of gunfire occurred between the two men before the assailant emerged from the car, firing a handgun, and fled across the parking lot towards the Winston Street Apartments.

Bell testified that the parking lot was illuminated by parking and neon store lights which enabled him to see his assailant. He stated that he saw his assailant's full face while he was in the car and saw the assailant's body profile as he ran across the parking lot. The parties stipulated at trial that Bell's assailant was approximately 15 feet from him when he obtained the full–face view. Bell described his assailant as a Black male, approximately 5'7" to 5'8" tall, weighing 150–160 pounds with a long chin and small features.

Four weeks after the incident, Bell identified appellant as his assailant on two separate occasions: once in an 8–man photograph display and again in a 6–man lineup in which every man, except appellant, uttered the words, "Hold it right there." Although appellant was the only lineup participant who refused to say the phrase, Bell testified that he recognized him as soon as he saw him even though he did not inform Detective Spicer, the officer present and responsible for the investigation. In court, Bell again identified appellant as his assailant. He also opined that appellant's voice resembled that of his assailant. To the best of Bell's knowledge, he had never seen appellant prior to the crime.

Detective Spicer, of the Henrico County Police Department, had responded to the crime and was responsible for the criminal investigation. His testimony supported Bell's with respect to the lighting conditions present in the parking lot. When Spicer arrived at the crime scene, he examined the car in which the assailant had sat. No keys or fingerprints were found inside the vehicle nor was there any indication that the car had been "hot–wired." Spicer, after discovering that the car belonged to Frank Carson, proceeded to question him. Then he transported Carson to the hospital where Bell was being treated to see whether Bell could identify him. Bell could not.

Spicer's one–month investigation culminated with the arrest of appellant in his apartment at the Winston Street Apartments. At that time, Spicer gave appellant *Miranda* warnings. Spicer confirmed that Bell made the two out–of–court identifications of appellant. According to Spicer, Bell was able to identify appellant at the lineup *before* the participants were requested to speak.

Frank Carson, the owner of the Chevrolet, testified that appellant was an acquaintance, who had borrowed his automobile 2 or 3 times but never without permission. According to Carson, his car could be driven without keys when the ignition was not locked. Carson testified that, on June 30, 1975, he used his car last between 8:00 and 8:30 p. m., and that shortly thereafter his car mysteriously disappeared only to be found later in the Safeway parking lot. To the best of his recollection, the ignition had been locked prior to its temporary disappearance.

The next witness for the state was 18 year–old Rose Marie Green. Green, who admitted that she was currently serving a sentence for a felony, testified that two weeks before the attempted robbery she had met appellant and James Dickson in her apartment where the subject of their conversation was robbing a Safeway store after closing. According to Green, appellant suggested that a female decoy be used and stated that he would use a sawed–off shotgun to commit the crime. Although no specific Safeway was mentioned as the target of the crime, when the two men discussed that the security guard had a gun, appellant allegedly said, "Yeah, but I'm not gonn'a worry about that," to which Dickson said "No, 'cause Beverly works there." On cross–examination, Green admitted that she and Dickson had been discussing the robbery before appellant arrived.

Appellant's defense consisted of his testimony and that of his girlfriend, Ruth McAllister, with whom he lived at the Winston Apartments. McAllister testified that she had asked appellant to go to the Safeway to purchase a few items for her on the evening of June 30, 1975. Because appellant did not own a car, she let him borrow her Ford Thunderbird. She watched him drive away. Despite her inability to remember the exact time when appellant left, she said it was late and that he returned about 30 to 35 minutes later. When he returned with her car he told her that there had been a shooting after a man had attempted to rob the security guard in the Safeway parking lot. McAllister said that she and appellant shopped at the Safeway on a regular basis both before and after the shooting and that appellant had said hello to Bell previously. She testified that she had never been convicted of a felony.

Testifying in his own defense, appellant repeated a story essentially identical to McAllister's but in more detail. He stated that when he left the Safeway he witnessed, along with the other customers, the exchange of fire between Bell and the would-be robber. After the incident he was standing near Bell and the store manager when he overheard the latter reprimand Bell and inform him that he would be suspended for violating a store rule because he responded violently to a robbery attempt. Appellant said that, as a regular Safeway customer, he had seen Bell in the store on numerous occasions. While he knew Carson, he claimed that he had only borrowed his car once and that he had not used it on the night of the crimes. In contradiction of Green's testimony, he denied knowing her, much less having ever been in her apartment. He stated that he knew who Dickson was but he did not know him personally.

On cross-examination, appellant admitted that he had been convicted of grand larceny in 1970. In response to the prosecutor's questions, he explained to the court that, pursuant to counsel's advice, he refused to utter the requested phrase at the lineup. Then this exchange occurred, without objection, between the prosecutor and appellant:

Q. Did you ever tell anyone in the police department about being in the Safeway?

A. No, I didn't.

Q. Never have told 'em about that?

A. They didn't even know I was there.

Q. Never told 'em before. This is the first time you've ever told anyone about this.

A. Right. This is the first time.

Q. Never told Spicer.

A. Never told Spicer or nobody anything. Spicer asked me about it and I'd look at him and laugh, and he said, "Go on, go on and get locked up." He act like he has a grudge or something against somebody.

Q. But you didn't tell him then that you were there and you'd been there?

A. No. When he asked me, he said, "What's this about a Safeway robbery over there by where you live at?" I looked at him, and shake my head, and laugh 'cause I know good and well I wouldn't do nothing like that near where I live at.

Shortly thereafter, during the cross-examination of Williams, this colloquy among the court, prosecutor, and defense counsel occurred:

[Prosecutor]: Why is it you've waited until today to tell anyone about you being at the Safeway store?

[Defense Counsel]: Your Honor, I object to this line of questioning.

[Court]: I think we've been over this once all ready . . .

In closing argument, the prosecutor, attempting again to impeach appellant's alibi testimony, referred to his silence when arrested. The references were as follows:

[Prosecutor]: And when is the first time that the police department knows anything about what this gentlemen [sic] knows about being in the Safeway? Today. He comes in here today and said that he was over there shopping,

heard some shootin'. Did he tell that to anybody? Any policeman?

[Defense Counsel]: Your Honor, I object to this line of argument. I would ask for a mistrial, sir.

[Court]: I overrule both motions, Mr. Ryder. It's an entirely admissible argument under the evidence in this case.

Attempting to reduce the harmful effect of the remarks about appellant's silence, defense counsel, in his closing argument, offered the following explanation of appellant's silence to the jury:

The Commonwealth's Attorney tells you in his closing argument, he argues to you, "Why does the defendant now say what he testified to?" "Being at the Safeway store," when he didn't tell Mr. Spicer about it? "Why did the defendant when in the lineup not say what Spicer wanted him to?" Well, the Commonwealth's Attorney wants you to get from that something bad, but you see he forgets, and he doesn't tell you that the law says that this defendant don't have to tell him nothing. He don't have to make any statement of any kind, in any way, shape, form, or fashion. You can't use against him because he didn't tell Spicer that he was up at the Safeway that night and saw it. He didn't have to tell him that. That's not evidence against him.

Later, in rebuttal argument, the prosecutor, for the fourth time, referred to appellant's postarrest silence by arguing in part:

[Bell] identified him in a physical lineup, and then the man refused to speak. Refused to say the very words that were used in this robbery. When did he come forward with the fact that he was at the Safeway? Today in Court. Use your common sense. . . .

Following the prosecutor's rebuttal, defense counsel repeated his motion for a mistrial "on the basis that the Commonwealth Attorney in his rebuttal argument also alluded to the fact that the defendant first testified today and had never told detective Spicer or anyone else about this story. . . ." To the motion, the court responded, "I have no inclination to grant the motion at all. I think all the arguments are in accord with the bonds [sic] of reasonable argument under all the circumstances. . . ."

Following the verdicts of guilty to the charges of attempted robbery and malicious wounding, appellant petitioned the Supreme Court of Virginia for a writ of error on several grounds, including the allegedly improper references to his postarrest silence. Relief was denied by that court in a brief order in which it held "there is no reversible error in the judgments complained of . . . ." No reference appeared in the opinion which would affirmatively indicate that the decision was based upon the procedural ground that appellant's counsel failed to object to the first reference to appellant's postarrest silence.

Appellant, in his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleged three grounds of error. The magistrate, in accordance with 28 U.S.C. § 636(b)(1) filed a proposed Memorandum Opinion in which he concluded that only appellant's third contention, which challenged the prosecutor's references to his postarrest silence, had merit. On the grounds that the references amounted to constitutional error, the magistrate recommended that the writ be issued. Disagreeing with the magistrate's opinion, the District Court denied the writ and granted summary judgment. That court held that the alleged error had not been preserved for review but that, even if error had been committed, it was harmless considering the overwhelming evidence introduced against the appellant.

### III

The case presents three questions:

A. Whether the failure to object on the initial occasion when the prosecution introduced into the case the defendant's postarrest silence precludes our consideration of the merits because of noncompliance with the Virginia contemporaneous objection rule.

B. If we are not thus precluded, whether the raising of defendant's postarrest silence invaded his constitutional rights.

C. Whether, if his constitutional rights were infringed, the error was nevertheless harmless.

### A. The effect of the contemporaneous objection rule.

■ Virginia Supreme Court Rule 5.21 provides in part:

> Error will not be sustained to any ruling below unless the objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice. Only errors assigned in the petition for appeal will be noticed by this Court and no error not so assigned will be admitted as a ground for reversal of a decision below. An assignment of error which merely states that the judgment is contrary to the law and the evidence is not sufficient.

*Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) holds that federal habeas corpus review of constitutional claims is precluded when an appellant fails to make a timely objection in accordance with a state's contemporaneous objection rule. *See Frazier v. Weatherholtz*, 572 F.2d 994 (4th Cir. 1978), *cert. denied*, 439 U.S. 876, 99 S.Ct. 215, 58 L.Ed.2d 191 (1978); *Satterfield v. Zahradnick*, 572 F.2d 443 (4th Cir. 1978), *cert. denied*, 436 U.S. 920, 98 S.Ct. 2270, 56 L.Ed.2d 762 (1978).

However, in *Wainwright* there was no objection made at any time during the trial with respect to inculpatory statements which the defendant subsequently asserted were improperly admitted. The defendant raised the issue for the first time on appeal, and the Florida court disposed of the case, not on the merits, but on procedural grounds. Here, however, while the matter was introduced into the trial through questions by the prosecutor in cross-examining the defendant without objection, subsequently objections were repeatedly raised both as to further questioning along the same line and as to argument made and reiterated in the prosecutor's closing speeches to the jury. The trial judge was thus afforded an opportunity, which he chose to decline, to take corrective steps.[3]

Only if the matter of evidence about and comment on defendant's postarrest silence is treated as wholly unitary and a rule applied that once the erroneous material is in without objection it is in for every purpose, including reiteration and emphasis over objection, is there any foundation for holding that the contemporaneous objection rule was not complied with here.

In our judgment, the several incidents were divisible, not presenting a single continuum for which the failure to object in the first instance would serve as a general waiver. The initial questioning may not have caused irreparable injury to the de-

---

**3.** The Court in *Wainwright*, 433 U.S. at 88, 97 S.Ct. at 2507, explains the purposes of the contemporaneous objection rule:

> A contemporaneous objection enables the record to be made with respect to the constitutional claim when the recollections of witnesses are freshest, not years later in a federal habeas proceeding. It enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question. . . .
>
> A contemporaneous-objection rule may lead to the exclusion of the evidence objected to, thereby making a major contribution to finality in criminal litigation.

Although appellant did not object to the first improper reference, he did register objections to the remaining three. It can hardly be said that appellant's trial counsel did not bring to the court's attention for corrective action the impropriety, under *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), of the references to his postarrest silence. Indeed, if the trial court had heeded defense counsel's urgings, the goals of the rule might have been realized; moreover, two of the four references might have been avoided, and further remedial action, such as instructing the jury to disregard the inadmissible evidence, could have been undertaken. *See also Reid v. Baumgardner*, 217 Va. 769, 775, 232 S.E.2d 778, 780–1 (1977). The initial failure to object may have reduced the degree of any impropriety attaching to the Commonwealth's actions sufficiently to excuse the further question, and to have made the lesser remedial action of a curative instruction adequate, where a mistrial might otherwise have been called for. It did not, however, constitute a carte blanche to repeat and aggrandize the error on several occasions despite timely objections by the attorney for the defendant.

fendant. However, any possibility that the matter did not register with the jury was eliminated by the repeated references, especially in closing argument. The objections to the later events concerned a separate and distinct aspect of the matter, were contemporaneous, and render *Wainwright v. Sykes* inapplicable.

In this connection, we do not intend to suggest that there was prosecutorial misconduct, since the case was tried in January 1976 and *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), which held testimony about and comment on postarrest silence a violation of a defendant's rights, was not decided until June 1976. The rule of that case has, nevertheless, been treated as fully retroactive.[4]

While we do not find prosecutorial overreaching, we do point out that the prosecutor took a large, and presumably precalculated, risk in proceeding as he did, for the subsequent decision in *Doyle* was plainly foreshadowed in *United States v. Hale*, 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975). There the constitutionality of reference to a defendant's postarrest silence for impeachment purposes arose with respect to a federal prosecution. Such utilization of postarrest silence was deemed by the Supreme Court to be "intolerably" prejudicial. While the affirmance of the Fifth Circuit's reversal of the conviction was on the grounds of exercise by the Supreme Court of its supervisory authority over lower federal courts, and so did not constitute a direct holding of unconstitutionality, the Supreme Court referred to the evidentiary matter it was addressing as having "grave constitutional overtones." Highly predictable, therefore, was the Supreme Court's answer to the question subsequently resolved in *Doyle*.

Having determined that the contemporaneous objection rule was, in fact, complied with here, we point out that there is nothing to suggest that the Supreme Court of Virginia had, on its own, reached a contrary result. Its terse order fully permits the conclusion that it rejected Williams' contentions on the merits, rather than on the basis of a failure to make a contemporaneous objection.[5] If its inscrutable order in fact amounted to a disposition of the matter on the merits, it, of course, rendered the rule of *Wainwright v. Sykes* inapplicable.[6] Such

---

**4.** *Reid v. Riddle*, 550 F.2d 1003 (4th Cir. 1977); *see Chapman v. United States*, 547 F.2d 1240, 1242–7 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Meeks v. Havener*, 545 F.2d 9 (6th Cir. 1976).

**5.** The Virginia authorities indicate that the point urged by appellant was adequately preserved by contemporaneous objection despite counsel's failure to raise it the first time it came up at trial. *See Reid v. Baumgardner*, 217 Va. 769, 774, 232 S.E.2d 778, 781 (1977):

Here, objection was timely made but overruled. Counsel should have insisted upon stating at that time the ground for his objection. Although he failed to do so, he subsequently renewed the objection, specified the reason for it, and requested the trial court to direct the jury to disregard the improper argument. These acts, while coming late in the proceedings, came soon enough to permit corrective action to be taken by the court. If the court had failed to understand the basis for the original objection, the explication cleared up any misunderstanding and afforded an opportunity for reconsideration and reversal of its earlier ruling. There was still time for the court to caution the jury to disregard the objectionable remarks.

**6.** *Compare County Court of Ulster County v. Allen*, 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979) in which the court explained the reasoning behind not denying habeas corpus review if the state court decision was not based upon failure to comply with a contemporaneous objection rule:

Our conclusion that it was proper for the federal courts to address respondents' claim is confirmed by the policies informing the 'adequate state ground' exception to habeas corpus jurisdiction. *The purpose of that exception is to accord appropriate respect to the sovereignty of the States in our federal system. Wainwright v. Sykes*, 433 U.S., at 88 [97 S.Ct. 2497 at 2507, 53 L.Ed.2d 594]. *But if neither the state legislature nor the state courts indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim.* (Emphasis added.)

*Cf. Bradford v. Stone*, 594 F.2d 1294, 1296 n. 2 (9th Cir. 1979) ("Although the intermediate state court did not pass unequivocally on the merits of the federal claim, we have chosen to assume the state's failure to rest exclusively upon the procedural default permits us to reach the federal question").

is also the case where, as here, there is nothing to show that the disposition by the Virginia Supreme Court was on a state procedural ground, rather than on the merits. Nor have we occasion to ponder the questions whether a perception that there was plain error suffices to render *Wainwright v. Sykes* inapplicable or whether the "cause and prejudice" exception to *Wainwright* operates here.[7]

B. *The unconstitutionality of the references to defendant's postarrest silence*

The decision in *Doyle* is controlling on the question of whether error of constitutional dimensions occurred in this case. In *Doyle* the defendant, who had been charged with selling marijuana, offered at trial, for the first time, an exculpatory story. According to Doyle's version of the events, he was not selling marijuana to the government informant but rather was attempting unsuccessfully to buy it from him. To impeach the defendant's credibility, the state, over defense objection, asked him, on cross-examination, a series of questions concerning why he had not related the story to the police. The prosecutor was permitted also to argue Doyle's postarrest silence to the jury.

Premising its decision on *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the court stated that it is implicit in the *Miranda* warnings that a defendant's silence will not be used against him. To impeach a defendant's exculpatory story by reference to his postarrest, post–*Miranda* silence breaches the implicit promise and violates due process. As expressed by the Court:

> Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post–arrest silence is insolubly ambiguous because of what the state is required to advise the person arrested.
>
> \*    \*    \*    \*    \*    \*
>
> In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 617–18, 96 S.Ct. at 2244–45. Because it is inherently unfair and inconsistent to allow the prosecutor to impeach a defendant with his silence when he is exercising his constitutional right to remain mute and because the jury can easily misconstrue such silence as evidence of guilt, the Court reversed and remanded the case,[8] noting that the state had not claimed that the error was harmless and providing for further proceedings not inconsistent with its opinion. *Id.* at 619 n.10, 620, 96 S.Ct. at 2245 n.10.

C. *The error was not harmless.*

An error is harmless only when the court, after assessing "the record as a whole to determine the probable impact of the improper evidence on the jury," can conclude beyond a reasonable doubt that the error did not influence the jury's verdict. *Morgan v. Hall*, 569 F.2d 1161, 1166

7. *Compare Rachel v. Bordenkircher*, 590 F.2d 200, 204 (6th Cir. 1978) ("We are of the opinion that these affidavits satisfy the 'cause' requirement of the *Wainwright* test. We are further of the opinion that the required 'prejudice,' in light of the clear constitutional violations committed in this case, can be presumed. ... Alternatively, 'we find no bar to habeas relief in this case because [petitioner's] trial counsel made no objection ... at the time of trial. The magnitude of the error in this trial would make it cognizable in a habeas proceeding as plain error even where no objection had been made before the trial court.'").

8. In *Jenkins v. Anderson*, ——, U.S. ——, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the Supreme Court, in distinguishing *Doyle*, reaffirmed its holding and, consequently, its applicability to this case. There, the petitioner was challenging the constitutionality of the state's actions in attempting to impeach his claim of self–defense by referring to his *pre*–arrest silence which, obviously, occurred before *Miranda* warnings were given. Holding that such a reference violated neither the Fifth or Fourteenth amendments, the Court was careful to distinguish *Doyle* on the grounds that governmental action–the giving of *Miranda* warnings after arrest–had induced the petitioner in *Doyle* to remain silent whereas in *Jenkins*, before arrest, there was no governmental action which induced the petitioner to remain silent. *Accord United States v. Serrano*, 607 F.2d 1145, 1151–52 (5th Cir. 1979).

(1st Cir. 1978), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978). *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Rowe*, 591 F.2d 391, 399 (7th Cir. 1979); *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir. 1978); *United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir. 1977). Whether an error is harmless is established through a case–by–case determination,[9]

**9.** The Fifth Circuit, in *Chapman v. United States*, 547 F.2d 1240, 1249–50 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977), in striving to establish concrete criteria for ascertaining harmless error where allusion to postarrest silence has occurred, set forth the following three situations in which the issue of harmless error may arise:

When the prosecution uses defendant's post--arrest silence to impeach an exculpatory story offered by defendant at trial and the prosecution directly links the implausibility of the exculpatory story to the defendant's ostensibly inconsistent act of remaining silent, reversible error results even if the story is transparently frivolous. . . .

When the prosecutor does not directly tie the fact of defendant's silence to his exculpatory story, *i. e.*, when the prosecutor elicits that fact on direct examination and refrains from commenting on it or adverting to it again, and the jury is never told that such silence can be used for impeachment purposes, reversible error results if the exculpatory story is not totally implausible or the indicia of guilt not overwhelming. . . .

When there is but a single reference at trial to the fact of defendant's silence, the reference is neither repeated nor linked with defendant's exculpatory story, and the exculpatory story is transparently frivolous and the evidence of guilt is otherwise overwhelming, the reference to defendant's silence constitutes harmless error. Chapman's fate is to instantiate this third rule.

If we were to follow unquestioningly that classification, our work would be over, for the present situation involves impeachment of an exculpatory story through explicit reference to the defendant's postarrest silence. The error, under *Chapman*, could not be harmless. The *Chapman* approach, however, lacks the flexibility of the case–by–case analysis and because of that, as the Fifth Circuit later noted, may be difficult to apply. For example, the situation presented in *United States v. Dixon*, 593 F.2d 626, 629 (5th Cir. 1979), *cert. denied*, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1980), fell between Categories II and III. There the court elected to use the case–by–case approach in lieu of *Chapman*. As *Dixon* indicates, resolution of the question whether a *Doyle* violation

reached after weighing the prejudicial effect of the improper evidence against the probative value of the' properly admitted evidence. The variables and the weights to be assigned them vary in each case.

The factors to be weighed include:

1. The use to which the prosecution puts the postarrest silence.[10]

2. Who elected to pursue the line of questioning.[11]

has had a harmful effect does not lend itself to mechanical analysis.

**10.** When refutation of an exculpatory defense is the purpose, attack is on the jugular of the defendant's case, his innocence, and it is rarely declared harmless. *United States v. Harp*, 536 F.2d 601, 602–03 (5th Cir. 1976) (despite the transparent and frivolous nature of the duress defense, the prosecutor's repetitive and emphatic remarks struck at the jugular of the defendant's story and could not be classified as harmless error); *see United States v. Meneses–Davila*, 580 F.2d 888, 895 ·96 (5th Cir. 1978); *Morgan v. Hall*, 569 F.2d 1161, 1167--68 (5th Cir. 1978), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978); *United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir. 1977) ("This testimony went to the heart of the sole defense, encouraging the jury to believe that the defense was fabricated after arrest, though this evidence cannot unambiguously indicate such tardy ingenuity"); *Reid v. Riddle*, 550 F.2d 1003, 1004 (4th Cir. 1977). *Compare Stone v. Estelle*, 556 F.2d 1242, 1246 (5th Cir. 1977), *cert. denied*, 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978) (allegedly improper comments went to question of defendant's cooperativeness and did not reflect on his innocence or even his exculpatory story); *United States v. Sklaroff*, 552 F.2d 1156, 1161–62 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978) (spontaneous reference to defendant's post–arrest silence was harmless when it was irrelevant to issues presented at trial, there having been no exculpatory story told by the defendant); *United States v. Davis*, 546 F.2d 583, 595 (5th Cir. 1977), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977) (prosecutorial remarks did not strike at the jugular of defendant's story).

**11.** If it was the defense who first injected the issue into the trial that consideration has been held to mitigate the harmful effect of the error. *See United States v. Dixon*, 593 F.2d 626, 630 (5th Cir. 1979), *cert. denied*, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1980); *United States v. Canales*, 585 F.2d 137, 139 (5th Cir. 1978); *United States v. Lopez*, 575 F.2d 681, 685 (9th Cir. 1978). *But see Morgan v. Hall*, 569 F.2d

3. The quantum of other evidence indicative of guilt.[12]

4. The intensity and frequency of the reference.[13]

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.[14]

Our listing of factors so far identified as relevant to the issue of whether mention of postarrest silence was harmless error is not intended to be exhaustive or exclusive. However, it suffices to solve our problem here.[15]

1161, 1168 (1st Cir. 1978), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978) ("Defense counsel only exposed the fact of silence; the prosecution tried to use this silence to undermine Morgan's story . . ."). Occasionally a witness will comment spontaneously upon a defendant's silence. In those instances, so long as curative action is taken, and the prosecution has refrained from highlighting the testimony, such an unsolicited remark is less harmful than similar statements intentionally elicited. *See United States v. Williams*, 556 F.2d 65, 66–67 (D.C. Cir. 1977), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); *United States v. Sklaroff*, 552 F.2d 1156, 1161–62 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978). *Cf. United States v. Whitaker*, 592 F.2d 826, 830–31 (5th Cir. 1979), *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1980) (prosecutor inadvertently elicited police testimony regarding defendant's silence).

12. *United States v. Dixon*, 593 F.2d 626, 630 (5th Cir. 1979), *cert. denied*, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1980); *United States v. Whitaker*, 592 F.2d 826, 831 (5th Cir. 1979), *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1980); *United States v. Bridwell*, 583 F.2d 1135, 1139 (10th Cir. 1978); *United States v. Williams*, 556 F.2d 65, 67 (D.C. Cir. 1977), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); *Stone v. Estelle*, 556 F.2d 1242, 1246 (5th Cir. 1977), *cert. denied*, 434 U.S. 1019, 98 S.Ct. 742, 54 L.Ed.2d 767 (1978); *Hayton v. Egeler*, 555 F.2d 599, 603 (6th Cir. 1977), *cert. denied*, 434 U.S. 973, 98 S.Ct. 527, 54 L.Ed.2d 463 (1977); *United States v. Davis*, 546 F.2d 583, 595 (5th Cir. 1977), *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977); *Meeks v. Havener*, 545 F.2d 9, 10 (6th Cir. 1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2980, 53 L.Ed.2d 1096 (1977); *United States v. Wycoff*, 545 F.2d 679, 682 (9th Cir. 1977), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977); *Jones v. Wyrick*, 542 F.2d 1013, 1014–15 (8th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 807 (1977).

13. One reference is less damaging than four; a lengthy colloquy is more prejudicial than a brief one. *United States v. Meneses–Davila*, 580 F.2d 888, 891–93 (5th Cir. 1978); *United States v. Williams*, 556 F.2d 65, 67 (D.C. Cir. 1977), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936,

53 L.Ed.2d 1070 (1977); *Hayton v. Egeler*, 555 F.2d 599, 603–04 (6th Cir. 1977), *cert. denied*, 434 U.S. 973, 98 S.Ct. 527, 54 L.Ed.2d 463 (1977); *United States v. Sklaroff*, 552 F.2d 1156, 1161–62 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); *Chapman v. United States*, 547 F.2d 1240, 1249 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977); *Meeks v. Havener*, 545 F.2d 9, 10 (6th Cir. 1976), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2980, 53 L.Ed.2d 1096 (1977).

14. *United States v. Dixon*, 593 F.2d 626, 629–30 (5th Cir. 1979), *cert. denied*, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1980); *United States v. Whitaker*, 592 F.2d 826, 831 (5th Cir. 1979), *cert. denied*, 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1980); *United States v. Bridwell*, 583 F.2d 1135, 1138–39 (10th Cir. 1978); *United States v. Johnson*, 558 F.2d 1225, 1230 (5th Cir. 1977); *United States v. Williams*, 556 F.2d 65, 67 (D.C. Cir. 1977), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1070 (1977); *United States v. Sklaroff*, 552 F.2d 1156, 1162 (5th Cir. 1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); *United States v. Wycoff*, 545 F.2d 679, 682 (9th Cir. 1977), *cert. denied*, 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977); *Jones v. Wyrick*, 542 F.2d 1013, 1015 (8th Cir. 1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 807 (1977); *Booton v. Hanauer*, 541 F.2d 296, 299 (1st Cir. 1976). Some courts have expressed doubt about the efficacy of curative instructions. "In no case has a prompt and forceful instruction alone been held sufficient to vitiate the use of post–arrest silence." *Morgan v. Hall*, 569 F.2d 1161, 1167–68 (1st Cir. 1978), *cert. denied*, 437 U.S. 910, 98 S.Ct. 3103, 57 L.Ed.2d 1142 (1978). *See also United States v. Prescott*, 581 F.2d 1343, 1352 (9th Cir. 1978).

15. The postarrest silence of Williams (1) was used by the prosecution to impeach his alibi, (2) was an issue introduced and pursued by the prosecution, (3) was brought out in a case where the other evidence of guilt was not overwhelming, (4) was a matter repeatedly referred to by the prosecution, and (5) was a matter as to which the trial judge gave no curative instructions. All the indicators, therefore, point to a "harmful" rather than a "harmless" classification for the error.

Of course, such an approach, awarding points on the basis of how the present factual situation measures up against tests devised for other cases need not constitute an absolutely foolproof one. We do not suppose that we have identified a universally applicable touchstone. Still a score of 5 to 0 is conclusive for the purposes of the present case. Considering the balancing exercises in which other courts have engaged in analogous situations where several of the test factors were present reinforces our conclusion.

Perhaps more than any other circuit court, the Fifth Circuit has had occasion to rule upon the harmfulness of *Doyle* errors. That court, in *United States v. Sklaroff*, 552 F.2d 1156 (5th Cir.1977), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978), held the error to be harmless when the witness spontaneously commented on the defendant's silence, the silence did not impeach an exculpatory story, the prosecutor made no reference to the silence, defense counsel objected to the testimony, and the court told the jury to disregard the testimony and gave a curative instruction.

Similarly, the error was held to be harmless in *United States v. Dixon*, 593 F.2d 626 (5th Cir. 1979), *cert. denied*, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1980). There the reference to defendant's silence was only slightly prejudicial because it did not impeach directly his exculpatory story. Moreover, the court gave a curative instruction; the prosecutor, after the remark by the witness, did not mention the defendant's silence again, the evidence of guilt was overwhelming; and the defendant opened the door by testifying that he cooperated with the police. *Id.* 629–30.

The Ninth Circuit, in *Bradford v. Stone*, 594 F.2d 1294 (9th Cir. 1979), held that the prosecutor's cross–examination question relating to the defendant's postarrest silence was harmless. Defense counsel did not register an objection to the question and, later, during closing argument, offered alternative explanations for the defendant's silence. In reply, the prosecutor, in rebuttal summation, told the jury that an adverse inference should be drawn from the defendant's silence and that the silence went to his credibility. The court reasoned that no harm occurred because the defense did not object to the first improper reference and later decided to pursue the subject in closing argument. When the defendant opened the subject in closing, the prosecutor's remarks were permissible, "[b]ecause ... under the circumstances, the *Doyle* error in cross–examination added nothing not properly before the jury when trial ended." *Id.* at 1296. Furthermore, the evidence against the defendant was overwhelming and his alibi was inconclusive and uncorroborated. *Id.* at 1296–97.

Those decisions in which the courts concluded that a *Doyle* violation was harmless obviously presented situations very different from that existing in the present case. The story told by Williams was plausible, and, if believed by the jury, should have led to an acquittal. Because the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception.[16]

In *United States v. Johnson*, 558 F.2d 1225 (5th Cir. 1977), the defendant asserted lack of knowledge as a defense to charges of importation and possession of cocaine. The cocaine was found in her suitcase. Because that defense was difficult to prove directly, the court was particularly concerned with the *Doyle* reference which "went to the heart of the sole defense." *Id.* at 1230. The court, in reversing the convic-

**16.** *United States v. Edwards*, 576 F.2d 1152, 1155 (5th Cir. 1978) ("We must therefore reverse. In so doing we note that the comment upon silence of the accused is a crooked knife and one likely to turn in the prosecutor's hand. The circumstances under which it will not occasion a reversal are few and discrete. We suggest that it be abandoned as a prosecutorial technique.") *See United States v. Luna*, 539 F.2d 417 (5th Cir. 1976) (in a brief per curiam opinion, the court summarily reversed the decision solely because of an improper *Doyle* reference used to impeach); *United States v. Stevens*, 538 F.2d 1203, 1206 (5th Cir. 1976) (it is reversible error for the court to deny a motion for mistrial after the prosecutor's improper question).

tion, concluded that "defendant's expressed desire to remain silent tipped the scales for the jury" after weighing: "(a) testimony that defendant appeared surprised upon learning of the presence of the cocaine, (b) the challenged testimony, (c) defendant's immediately subsequent denial of knowledge of the cocaine, and (d) testimony that defendant had bought the suitcase in a Miami flea market about a week prior to her trip to Panama, and kept the suitcase by her bed while in Panama." *Id.* at 1230.

The case of *Reid v. Riddle*, 550 F.2d 1003 (4th Cir. 1977) presented this Circuit with a *Doyle* violation. The defendant was arrested for murder. After receiving *Miranda* warnings, he elected to remain silent. To exculpate himself, at his trial, he claimed self–defense. The prosecutor then proceeded to inquire of the defendant whether he had disclosed previously the defense to police or to anyone. Defense counsel quickly objected and moved for a mistrial; the court overruled the objection and denied the motion. During his closing argument, the prosecutor reminded the jury that defendant had not asserted self–defense until trial. When defense counsel objected and requested a curative instruction, all the court would say was that the defendant had a constitutional right not to make a statement. It did not instruct the jury that defendant's silence was not evidence of guilt.

In holding that the error was not harmless, we stated:

The key issue in the case was Reid's motive in slaying the victim; if the jury had accepted Reid's version of events, it could not have convicted him of first–degree murder. While there is strong evidence in the record to support the prosecution's theory that the victim was killed in the midst of a robbery, there was no eyewitness to the events immediately preceding the homicide. Reid and the victim were friends, and Reid had openly come to the hotel to visit him. In addition, Reid's account is supported by the police finding the victim's dead body holding a stick. Further, Reid's conten-

tion that he carried a knife not as a tool for robbery, but for self–protection is supported by a police report that he had been robbed by a teenage gang. Also, the defense showed a material discrepancy between the desk clerk's testimony at the preliminary hearing and at the trial. *Id.* at 1004.

Attempting to distinguish harmful from harmless error, the Seventh Circuit, in *United States v. Rowe*, 591 F.2d 391, 400 (7th Cir. 1979), adopted the district court's opinion which noted that each case holding that a *Doyle* violation constituted harmless error involved a single improper question and a situation in which no suggestion was made in cross–examination or closing argument that the defendant's silence impeached his trial testimony. The court found that the error was not harmless inasmuch as there were several improper references designed with the express purpose of impeaching the defendant's exculpatory story and indicating a recent fabrication. Since the defendant's self–defense claim was not transparently frivolous, and the jury may have been persuaded by the improper observations, it was immaterial that the evidence was otherwise sufficient to support the conviction.

With respect to the sufficiency of the evidence, it should be emphasized that the sufficiency issue is distinct from that of harmless error. Evidence may be sufficient to sustain a conviction yet may be so thin that it will not render the error harmless. *United States v. Edwards*, 576 F.2d 1152, 1155 (5th Cir. 1978) illustrates the interaction of the two concepts and the recognition by the Fifth Circuit that *Doyle* violations are rarely harmless. The court stated:

In sum, although the evidence is somewhat thin, it is sufficient to support the conviction. However, the weakness of the evidence makes it impossible to view the prosecutor's comments on Edwards' silence as harmless error, as we might do were the evidence stronger. The prosecutor by his comments brought the defendant's silence upon arrest and at trial to the attention of the jury, apparently intending to shore up his less–than–over-

whelming evidence by leading the jury to make inferences of guilt from defendant's silence.

Application of the principles derivable from the cases leads us inescapably to the conclusion that the repeated error committed in the present controversy was not harmless. The prosecutor made not one but four references to appellant's silence, the clear purpose of which was to impeach his alibi through the introduction of his silence as substantive evidence of guilt. Appellant's alibi was neither transparently frivolous nor uncorroborated. By her testimony, McAllister, an unimpeached witness, provided full support to appellant's defense. While Green testified about an alleged robbery conspiracy two weeks prior to the incident, she was a convicted felon whom appellant denied knowing. Moreover, her testimony was inconclusive; it referred to a general discussion but not to specific actions taken in furtherance of the alleged conspiracy. The other evidence against appellant, while sufficient to sustain a conviction, was not persuasive enough to tip the scale towards harmless error. Bell's in— and out—of—court identifications, although constituting strong evidence, must be balanced with appellant's plausible and corroborated alibi. We are unable to conclude, therefore, that the error did not affect the jury's verdict.

As the court cautioned in *Chapman v. United States*, 547 F.2d 1240, 1250 (5th Cir. 1977), *cert. denied*, 431 U.S. 908, 97 S.Ct. 1705, 52 L.Ed.2d 393 (1977):

> The infusion of "harmlessness" into error must be the exception, and the doctrine must be sparingly employed. A miniscule error must coalesce with gargantuan guilt, even where the accused displays an imagination of Pantagruelian dimensions.

The judgment of the district court is reversed and the case remanded with instructions to issue the writ of habeas corpus. Unless the commonwealth elects to retry the defendant within a reasonable time, he should be released.

*REVERSED AND REMANDED WITH INSTRUCTIONS.*