889 F.2d 1085
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff--Appellee,
v.
Lloyd George MAXWELL, a/k/a Slider, Defendant--Appellant.
 No. 88-5085.
 United States Court of Appeals, Fourth Circuit.
 Argued March 10, 1989.
Decided Nov. 2, 1989.
 
 Gary S. Berstein (William H. Murphy, Jr., on brief) for appellant.
 John Vincent Geise, Assistant United States Attorney (Breckinridge L. Willcox, United States Attorney, on brief) for appellee.
 Before MURNAGHAN and SPROUSE, Circuit Judges, and ROBERT J. STAKER, United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Appellant Lloyd G. Maxwell was tried and convicted by a jury in the United States District Court for the District of Maryland upon one count charging him with a Title 21 U.S.C. Sec. 846 conspiracy to violate 21 U.S.C. Sec. 841(a)(1), and upon a second, substantive count charging him with a violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2, both counts involving cocaine.
 
 
 2
 In this appeal, Maxwell challenges those convictions, contending that his post-arrest, post-Miranda silence was improperly made known to the jury by the government and is plain error and that the district court committed reversible error in defining reasonable doubt to the jury in an instruction given over his objection. We reject these contentions and affirm the convictions.
 
 I.
 
 3
 On Febraury 9, 1987, Oscar Hayes, driving from Florida enroute to Baltimore, was stopped in North Carolina by police for a traffic violation. When the police searched his car, they found a suitcase containing two pounds of cocaine and seven pounds of marijuana in the trunk. Hayes admitted he was a drug courier for an individual named "Slider" and agreed to cooperate with narcotics officers in setting up a controlled delivery of the cocaine. Hayes also told the officers that he and an individual named Iloe McKenzie had made a previous delivery of drugs to Baltimore for "Slider."
 
 
 4
 Hayes made a monitored telephone call to a telephone number he told the police "Slider" had given him and reached co-defendant Brown's place of business in Baltimre. "Slider" was not there. Hayes left the message that his car was being repaired at a garage and left a telphone number of that garage. Actually, the garage ws nonexistent and the telephone number was that of a special police line telephone used in North Carolina undercover operations (hereinafter, "the garage"). Several minutes later, a call was received at the garage for Hayes from "Slider". That call was later determined to have been placed from Maxwell's Winter Haven, Florida, residence. In that call, "Slider" instructed Hayes to call the Baltimore telephone number when he arrived in that area. Hayes and the officers then departed for Baltimore. The following morning, a second call was received at the garage. That call was determined to have been placed from co-defendant Brown's place of business in Baltimore. The caller inquired whether Hayes' car was still at the garage.
 
 
 5
 Upon their arrival in Baltimore, Hayes and the officers went to a Shell Station there, where they placed Hayes' car on a hoist and removed a wheel. Hayes then telephoned "Slider" and related to him that Hayes' car had broken down and had been towed to that Shell Station.
 
 
 6
 Approximately ninety minutes later, Maxwell and Brown arrived at the Shell Station. Hayes identified Maxwell as "Slider" to one of the undercover officers. Maxwell walked over to Hayes' car, questioned the mechanic (in reality, an undercover narcotics officer) with regard to the nature of Hayes' car trouble, and visually inspected the undercarriage. Unable to see a problem with the car, Maxwell directed that it be taken off the hoist and the wheel replaced. While the wheel was being replaced, Maxwell, Brown and Hayes went to the rear of the car, Maxwell opened the trunk, looked inside, and then closed the trunk. Maxwell then filled his car with gasoline, and indicated to Brown and Hayes it was time to go. As they attempted to drive away, Maxwell and Brown were placed under arrest and Miranda warnings were read to them. Brown were placed under arrest and Miranda warnings were read to them. Brown allegedly shouted, "I don't know anything about the cocaine in that car!" Maxwell remained silent. An inventory search of Maxwell's personal effects uncovered, among other things, $600 in cash in Maxwell's wallet and a traffic ticket issued to Iloe McKenzie in January, 1987.
 
 
 7
 At trial, each of defendants Maxwell and Brown testified on his own behalf and offered an exculpatory story. Brown denied any knowledge of drug activity between Maxwell and Hayes. While Maxwell eventually admitted that he made the phone calls to the garage, he persisted in denhing his involvement in drug trafficking. He claimed he was a mechanic and was at the Shell Station for the sole purpose of inspecting and repairing Hayes' car. He also claimed to be in the business of transporting "yams" from Jamaica to the United States as further explanation of his frequent phone calls and visits to Baltimore, his association with Iloe McKenzie and the large amount of cash in his wallet at the time of his arrest. Maxwell's testimony was only partly corroborated by the testimony of his wife and that of his accountant/business partner.
 
 
 8
 The jury chose to disbelieve Maxwell's account and found him guilty. Brown was acquitted on both counts. Maxwell was sentenced to two concurrent five-year terms of imprisonment, a four-year special parole term was imposed and special assessments of $100 were assessed against him. Maxwell does not challenge the sufficiency of the evidence in support of his convictions.
 
 II.
 
 9
 The first issue is whether error of constitutional dimensins occurred at trial requiring reversal of Maxwell's convictions pursuant to Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Doyle holds that it is fundamentally unfair to promise an arrested person that his silence will not be used against him when he is given the Miranda warnings and thereafter to breach that promise at trial by using his silence following those warnings to impeach his trial testimony. See, Wainwright v. Greenfield, 474 U.S. 284, 290, 106 S.Ct. 634, ----, 88 L.Ed.2d 623, 629 (1986).
 
 
 10
 The fact that Maxwell did not talk to narcotics officers after he was arrested and the Miranda warnings were read to him was mentioned by prosecution witnesses on three occasions during the government's case-in-chief:
 
 
 11
 During cross-examination by Maxwell's counsel of Special Agent Grimes, the arresting officer, the following exchange took place:
 
 
 12
 Q. And are you satisfied that Mr. Maxwell is the source of the drugs?
 
 
 13
 A. To Mr. Hayes, yes. As far as being the source of the drugs, I don't believe so. I believe the drugs came from Columbia, South America, and I don't believe Mr. Maxwell knows how to make cocaine.
 
 
 14
 Q. Do you believe Mr. Maxwell knows how to smuggle it in?
 
 
 15
 A. Oh yes, sir, I sure do.
 
 
 16
 Q. Did you follow that line of inquiry?
 
 
 17
 A. I didn't have the opportunity, no, I didn't.
 
 
 18
 Q. Between what time and what time you did not have the opportunity?
 
 
 19
 A. I have never spoken to Mr. Maxwell because he didn't want to answer my questions.
 
 
 20
 Q. How about your own investigations between the time of arrest and the time of indictment?
 
 
 21
 A. Mr. Maxwell is the only person who knowns the answer to that question and he refused to answer any questions. So I have no way of following it up.
 
 
 22
 Later,. during cross-examination of Special Agent Grimes by Maxwell's counsel, the following additional exchange occurred.
 
 
 23
 Q. So, Mr. Grimes, I am going to come back to the time of the arrest, abviously. Did Mr. Maxwell ever express any concern about getting money from, you know, as to how he was paying for the drugs, did any such question come up?
 
 
 24
 A. No, sir. Just--well, excuse me. Not to pay for the drugs but money to pay Oscar Hayes for transporting them.
 
 
 25
 Q. Did he ever say anthing about that?
 
 
 26
 A. He never said anything. After the arrest, after the arrest, Mr. Maxwell did not say anthing.
 
 
 27
 Finally, after Special Agent Grimes testified, Special Agent Rayna, who assisted in Maxwell's arrest, testified as follows on direct examinatin:
 
 
 28
 Q. Now, you have been present, Special Agent Rayna, and was there a conversation with Special Agent Grimes about what was said? Were you present for any of that?
 
 
 29
 A. The conversation at the white car, I was not present.
 
 
 30
 Q. After the an [sic] arrest, ma'am, there was a discussion--in court there has been a discussion about some questions addressed the [sic] Special Agent Grimes and his responses.
 
 
 31
 A. Yes.
 
 
 32
 Q. Were you present for that?
 
 
 33
 A. Yes, sir.
 
 
 34
 Q. Would you discuss with the members of the jury what happened.
 
 
 35
 A. I can only relate to yu what happened with Mr. Maxwell. He read him his rights and asked him if he understood those rights, and Mr. Maxwell said yes, and that was all we could talk about. He did not wish to talk further.
 
 
 36
 Maxwell's counsel never made any objection to any of this testimony in these three instances, never made a motion to strike, never requested the court to give a curative instruction, and never moved for a mistrail. Nor did the district court sua sponte take any action to negate any prejudicial effect of the references to Maxwell's post-arrest, post-Miranda silence.
 
 
 37
 In Williams v. Zahradnick, 632 F.2d 353, 363 (4th Cir.1980), this court established a five-prong test for determining the prejudicial effect of a Doyle error:
 
 
 38
 (1) The use to which the prosecution puts the post-arrest silence.
 
 
 39
 (2) Who elected to pursue the line of questioning.
 
 
 40
 (3) The quantum of other evidence indicative of guilt.
 
 
 41
 (4) The intensity and frequency of the reference.
 
 
 42
 (5) The availability to the trial judge of the opportunity to grant a motion for a mistrail or to give curative instructions.
 
 
 43
 Id. at 361-62 (footnotes omitted). As applid to the facts before us, we note that only one of the trhee references to Maxwell's post-arrest, post-Miranda silence ws made in an answer to a question propounded by the prosecutor. Before that one reference was made, the fact that Maxwell had refused to talk after Miranda warnings had been read to him had been testified to twice by Special Agent Grimes in answer to questions propounded to him by Maxwell's counsel without objection so far as the record shows, the three references to Maxwell's silence in the testimony were isolated ones, were gratuitously and unresponsively offered by the witnesses in answer to the questions posed, and were neither designed as, nor indicative of, a strategy by the prosecution to undermine Maxwell's defense. The prosecutor never made any reference to Maxwell's post-arrest silence in questioning witnesses or in argument to the jury. Although it was improper for prosecution witnesses to mention that Maxwell had refused to talk after Miranda warnings had been read to him, and no curative instructions were given due to the absence of objection, we hold the references were harmless under Williams v. Zahradnick, supra, in view of the quantum of other evidence independently establishing his guilt.
 
 III.
 
 44
 Maxwell next contends that the district court erred in giving an instruction on the definition of reasonable doubt in its charge to the jury over his objection.
 
 
 45
 While this court has repeatedly admonished district courts not to attempt to define reasonable doubt in their instructions absent a specific request from the jury itself, we have held that attempts at defiing reasonable doubt in a charge to the jury does not constitute reversible error per se. See United STates v. Porter, 821 F.2d 968, 972 (4th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988); United States v. Moss, 756 F.2d. 329, 333 (4th Cir.1985). Consequently, our inquiry on appeal is directed at whether and to what extent the challenged instructions given in this case, when viewed in the context of the instructions as a whole, create confusion and impermissibly lessen the required burden of proof. Id.
 
 
 46
 The reasonable doubt instruction given in this case emphasized that the degree of proof required for conviction had to be of "such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his or her own affairs." This instruction appears neither misleading nor confusing. It correctly conveys the concept of reasonable doubt.[1]
 
 
 47
 The district court also cautioned the jury in its charge that "the law presumes a defendant to be innocent of crime" and "the presumption of innocence alone is sufficient to acquit a defendant." Moreover, the district court informed the jury that "the burden is always upon the prosecution to prove guilt beyond a reasonable doubt" and "[t]his burden never shifts to the defendant." Thus, the instructions taken as a whole properly described the prosecution's burden and the protection the law affords the accused. While we cannot endorse the district court's attempt to define reasonable doubt, we conclude that the instruction given in this case was not plain error and does not warrant reversal of appellant's convictions.
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 The reasonable doubt instruction given by the district court is a commonly used pattern instruction. 1 E. Devitt & Blackmar, Federal Jury Practice & Instructions Sec. 11.14 (3rd Ed. 1977)