George Smith ALSTON, Appellant,

v.

Samuel P. GARRISON, Rufus Edmisten, Attorney General of N.C., Appellee.

No. 82–6799.

United States Court of Appeals, Fourth Circuit.

Argued April 13, 1983.

Decided Nov. 3, 1983.

Michael T. Medford, Raleigh, N.C. (Manning, Fulton & Skinner, Raleigh, N.C., on brief), for appellant.

Richard N. League, Sp. Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen. of N.C., Raleigh, N.C., on brief), for appellee.

Before MURNAGHAN, SPROUSE and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

George Smith Alston appeals from the denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. He chiefly argues that his trial counsel's failure to object to prosecution evidence that he "stood on his constitutional rights" to remain silent denied him the effective assistance of counsel in violation of the sixth and fourteenth amendments, to a degree that prejudiced the outcome of his trial. We agree and reverse the judgment of the district court, directing the issuance of a writ of habeas corpus conditional on the results of a new trial.

I.

Around midday on December 30, 1976, James DeLay, who was traveling on foot in the vicinity of Spring Lake, North Carolina, accepted a ride from a stranger. This individual took DeLay to a secluded area in rural Cumberland County, held him at gun point, and ordered him to write a check for $250.00 payable to the order of a name which the assailant supplied. The assailant then fired twice at DeLay, wounding him in the back with the second shot.

Next in this strange chain of events, the assailant ordered DeLay to get up and walk through the woods. When they stopped to rest, DeLay suggested that a check made out to "cash", rather than a person's name, would be processed more quickly at the bank. The assailant agreed, and DeLay wrote out a check for $265.00 payable to cash. The first check was destroyed.

The assailant and DeLay then drove to a branch of the Cape Fear Bank in Fayetteville, and DeLay's check was cashed at a drive-in window. Afterwards the assailant drove DeLay back to Spring Lake and released him.

Later that evening, George Alston was arrested and charged with armed robbery, kidnapping, and assault with intent to kill inflicting serious injury.

II.

Alston was tried three times, with the first two trials ending in hung juries. At each trial, the State introduced the following evidence tending to show that Alston was DeLay's assailant:

1. Alston was arrested in a car similar to that described by DeLay as the vehicle of his assailant. Alston's car was a white 1973 Pontiac Grand Prix with a white vinyl roof compared with DeLay's description of a white Monte Carlo, Buick or Grand Prix with a red landau roof.

2. At the time of his arrest, Alston had in his possession a .32 caliber pistol containing six rounds of ammunition.

3. On January 5, 1977, DeLay selected the name George Alston from a police-prepared list of four names, Johnson, Alston, Alton and Alman, all preceded by the name George, as the name he wrote on the first check.

4. Also on January 5, 1977, DeLay selected a photograph of Alston out of a display of six photographs as that of his assailant.

5. On January 22, 1977, DeLay picked Alston out of a line-up consisting of six black males between the ages of 20 and 25, all approximately six feet tall and of medi-

um build, characteristics which matched De-Lay's description of his assailant.

6. The bank teller at the drive-in window of the Cape Fear Bank indicated that Alston's picture looked familiar when it was shown to her along with other photographs.

7. Ballistics evidence indicated that a bullet removed from DeLay's back had been fired by the .32 caliber weapon in Alston's possession at the time of his arrest.

The following evidence, however, tended to show that Alston was not DeLay's assailant:

1. Alston's car was white with a white top, while DeLay's description of his assailant's car referred to a red top.

2. At the time of his arrest, Alston was accompanied by three black males and a black female, and the vehicle which he was driving when arrested was registered in the name of David Gaylor, one of the passengers in the car.

3. Although DeLay testified that he wiped blood from his wound onto the seats of the car in which he was abducted, no blood was found by police in the car in which Alston was arrested. Additionally, Detective Burns, who was in charge of the investigation, testified that the vehicle had not been dusted for fingerprints to determine whether DeLay's fingerprints were in the car. (At an earlier trial, he erroneously testified that the car had been dusted for fingerprints.)

4. When DeLay first reported the crime to authorities, he was unable to recall the name which the assailant had directed him to write on the first check. When he attempted to spell the first name as "G-E-O-G", an agent for the Army Criminal Investigation Division suggested "George", and DeLay agreed that it sounded familiar. With respect to the last name, DeLay told the agent that "Johnson" sounded familiar. It was only after the arrest of Alston that Agent Atkinson wrote out four names, Johnston, Alston, Alton and Alman, all pre-

ceded by the name George, from which DeLay selected the name George Alston.

5. Prior to the January 5, 1977 photographic identification, DeLay was shown another series of photographs containing a photograph of Alston but was unable to identify any of the individuals as his assailant.

6. There was evidence from which the jury might have found that DeLay had seen Alston in the courtroom on January 19, 1977, thus tainting his identification of the petitioner at the line-up three days later.

7. The bank teller testified that her attention during the check cashing was directed at DeLay, and that she could not positively identify the individual who was with him at the time.

8. While there was evidence that DeLay's assailant handled the check cashed at the Cape Fear Bank, no fingerprints of Alston were found on the check, although fingerprints belonging to DeLay and other unidentified individuals were found.

9. Testifying in his own behalf, Alston stated that he visited a neighbor, Linda Rhue, at her trailer from approximately 12:30 P.M. to 3:30 P.M. on December 30, 1977, the time of the crime. This was corroborated by Rhue.

10. Alston testified that he had left his gun at home while visiting Rhue. When he returned home and prepared to go out for the evening he took the gun and put it in his pocket because he planned to visit some rough local night clubs.

### III.

During Alston's third trial, the State introduced evidence that at the time of his arrest Alston declined to answer questions after being informed of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1] The following exchange took place between the prosecutor and Detective Burns:

---

1. Neither party presently recalls whether similar evidence was admitted at Alston's first two    trials.

Q: After advising him of his constitutional rights did you talk with him at all?

A: Well, sir, he stood on his constitutional rights.

Q: In other words, he didn't say anything to you at that time, did he?

A: He started to converse, sir, and then he just shut up and he said I want my lawyer and we abided by his wishes.

Defense counsel did not object to the admission of this evidence. In cross-examination of Detective Burns, Alston's lawyer asked what had prompted the police to designate Alston as the chief suspect in the case. Burns gave four reasons:

Up until this point the facts that we had uncovered were that (1) Mr. Alston fitted the description physically of the person who had robbed, kidnapped and shot Mr. DeLay; (2) he was operating a vehicle that fitted the description of the car that was utilized in the commission of the crime; (3) he was stopped on the military reservation of Fort Bragg [where] he had in his possession a weapon, a .32 caliber pistol with six rounds of .32 ball ammunition in it; and (4) *he did not give any statement concerning—I would say his activities on the date of the 30th of December, 1976. As I stated, he stood on his constitutional rights.* (emphasis added)

A bit later in the cross-examination, Burns described his encounter with Alston following the latter's arrest.

Mr. Alston started to talk after I read him his constitutional rights, and then he stood on his rights. He shut up. He said I want a lawyer. Right away, I respected his wishes.

Alston's lawyer made no attempt to have this testimony stricken and to obtain a curative instruction from the court to the jury.

The jury returned a verdict of guilty, and Alston was sentenced to life plus twenty years imprisonment. Alston's trial counsel took an appeal to the North Carolina Supreme Court which was denied. Alston then filed, *pro se,* a petition for state habeas corpus relief in Cumberland County Superior Court, claiming ineffective assistance of counsel in contravention of the sixth and fourteenth amendments to the United States Constitution. After that petition was denied, he filed a Motion for Appropriate Relief, which was dismissed without an evidentiary hearing on March 16, 1979. The North Carolina Court of Appeals affirmed and the North Carolina Supreme Court denied certiorari on June 18, 1979.

Alston began his pursuit of federal habeas relief on January 22, 1981, filing a petition under 22 U.S.C. § 2254 in the federal district court for the Eastern District of North Carolina. On October 28, 1981, the court granted the State's motion to dismiss, denying Alston's petition on the ground that he had failed properly to raise his claims at trial, on direct appeal from his conviction, and in his post trial motions in the North Carolina courts, and that he was thus barred from any relief in federal court under 22 U.S.C. § 2254 for failure to exhaust state remedies. After Alston informed the court that he had in fact raised the claims contained in his federal habeas petition in his state court Motion for Appropriate Relief, the district court entered a new order holding that Alston was denied the effective assistance of counsel,[2] but that in light of all the evidence, the constitutional error was harmless. The writ was, therefore, denied.

### IV.

Under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and *Cole v. Stevenson,* 620 F.2d 1055 (4th Cir. 1980) (en banc), *cert. denied,* 449 U.S. 1004,

**2.** The district court was not troubled by the fact that Alston had not complied with North Carolina's contemporaneous objection rule on his sixth amendment claim, reasoning that "[a] finding of ineffective assistance of counsel sufficiently demonstrates 'cause' [for nonobjec-

tion] and 'prejudice' [resulting from the constitutional violation] and will allow the court to address issues affected by this claim on their motion." *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

101 S.Ct. 545, 66 L.Ed.2d 301 (1980), a state rule requiring contemporaneous objection at trial to alleged errors of law bars federal habeas review of issues that were not objected to or appealed in state proceedings. Only if the petitioner for federal habeas relief can show good cause for failing to raise the issue in the state proceedings and actual prejudice to the outcome of the trial can he or she obtain federal review of constitutional claims. In this case, the claim of ineffective assistance of counsel obviously was not raised by Alston's counsel, either at trial or on appeal. Therefore, Alston seeks to place himself within the cause and prejudice exception to *Wainwright*. He offers as cause for failing to raise the issue below the fact that Alston's trial counsel continued to represent him through his unsuccessful direct appeal to the North Carolina Supreme Court and could hardly have been expected to assert his own incompetence.

■ We are satisfied with Alston's excuse for failing to raise his ineffectiveness claim at trial and on state appeal. The content of an appeal is heavily controlled by counsel, and where, as here, the defendant's trial lawyer also prosecuted the appeal, it is obvious that ineffective assistance of counsel is not likely to be raised at trial or to appear among the assignments of constitutional error. *Cf. Towndrow v. Henderson,* 692 F.2d 262 (2d Cir.1982) (where defendant was represented by *new* counsel on direct appeal, failure to assert sixth amendment claim invoked the *Wainwright* bar to federal review); *United States ex rel. Caruso v. Zelinsky,* 689 F.2d 435 (3d Cir.1982) (where state rule required collateral claims to be raised within five years of conviction, *Wainwright* bar applied to federal habeas petitioner who did not assert ineffectiveness claim until more than five years after conviction).

■ We also believe that trial counsel's undisputed incompetence worked to Alston's actual and substantial prejudice, infecting the entire trial. *See United States v. Frady,* 456 U.S. 152, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Few mistakes by criminal defense counsel are so grave as the failure to protest evidence that the defendant exercised his right to remain silent. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir.1980). Such evidence plants in the mind of the jury the dark suspicion that the defendant had something to hide, and that any alibi which is subsequently proffered is pure fabrication. The Supreme Court best stated these concerns in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), holding that comment on a defendant's post-arrest silence violated due process of law:

> The warnings mandated by [*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] as a prophylactic means of safeguarding Fifth Amendment rights ... require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested .... Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Id.* 426 U.S. at 617–18, 96 S.Ct. at 2244–45 (citations and footnotes omitted). In the present case, defense counsel permitted evidence of Alston's silence to come in not once, but on three separate occasions. Alston's defense of alibi stood faint hope of impressing the jury under these circumstances, so in our opinion, the petitioner has adequately demonstrated the existence of prejudice flowing from his counsel's incom-

petence, as required under the cause and prejudice caveat to *Wainwright v. Sykes.*

### V.

We turn next to the merits of Alston's constitutional claim. There can be no doubt, as indeed the district court held, that the representation rendered by Alston's court-appointed attorney grossly violated the defendant's sixth amendment rights. Since 1976, when *Doyle v. Ohio* was decided, the law has been clear that admitted evidence of post-arrest silence violates due process of law. Failure to oppose the admission of such evidence plainly falls beneath the "range of competence demanded of attorneys in criminal cases." *Marzullo v. Maryland,* 561 F.2d 540, 543 (4th Cir.1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978).[3]

Next we must decide on the record before us whether the constitutional error was harmless. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In the recent case of *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), the Supreme Court considered the harmless error doctrine where evidence was admitted that the defendants stood mute. The Court first noted that "a judgment may stand only when there is no reasonable possibility that the [practice] complained of might have contributed to the conviction.'" *Id.* —— U.S. at ——, 103 S.Ct. at 1979, 76 L.Ed.2d at 104, quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). The Court then held that the proper inquiry was whether viewing the entire record it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent evidence of the defendant's silence. *Id.* —— U.S. at ——, 103 S.Ct. at 1981, 76 L.Ed.2d at 107. The *Hasting* Court answered that question affirmatively where victims of a communal rape promptly and positively identified the defendants in a police line-up; where neutral witnesses also saw the defendants escorting the women; and where the crime vehicle—a turquoise Cadillac—was a singular color and was registered to one of the defendants.

Here, in contrast, the evidence is not so airtight. While some of the evidence against Alston was indeed potent, especially the testimony that Alston had possession of the crime weapon, nagging gaps in the proof appear: the absence of the defendant's fingerprints on the check extorted from DeLay; the failure by authorities to dust for the victim's fingerprints in the alleged crime car; the absence of bloodstains in the car where the victim allegedly sat wounded; the registration of the car to someone other than Alston; DeLay's initial failure to pick Alston's face out of a mug book. This evidence provoked enough doubts to result in hung juries the first two times Alston was tried.

Furthermore, "because the nature of a *Doyle* error is so egregious and so inherently prejudicial, reversal is the norm rather than the exception." *Williams v. Zahradnick,* 632 F.2d 353, 363 (4th Cir.1980) (footnote omitted). In *Williams,* this court distilled five factors to be weighed in determining whether a *Doyle* error was harmless:

1.  The use to which the prosecution puts the post-arrest silence.

2.  Who elected to pursue the line of questioning.

---

**3.** Further evidence of counsel's incompetence is seen in the failure to object to testimony by Detective Burns that counsel congratulated police on the quality of the line-up out of which Alston was picked as the assailant:

Q.  Did [appointed defense counsel] tell you anything about the line-up?
A.  He said that was a mighty fine line-up. He said that was the best one he had ever saw—I don't remember if he said it was the best one he ever saw but he said it was a very good line-up.

While Alston's counsel had no business making such a statement in the first place, the real damage resulted from his failure to object when the statement was presented at trial. By this evidence, counsel appeared to vouch for the accuracy of the line-up which inculpated his client. The very essence of the adversarial system is violated by a performance such as this one by counsel.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

*Id.* at 361–62 (footnotes omitted). As applied to the facts before us, we note that it was the prosecutor who first deliberately elicited evidence of Alston's silence, evidence which tended to undermine Alston's alibi defense. Later, on cross-examination, defense counsel managed twice to hand Detective Burns opportunities to point out that Alston "stood on his constitutional rights." No tactical maneuver can explain the failure of counsel to keep out this evidence. The quantum of other evidence indicative of guilt in our opinion "was not persuasive enough to tip the scale towards harmless error." *Williams v. Zahradnick,* 632 F.2d at 365. As to "the intensity and frequency of the reference," Detective Burns three times distinctly alluded to Alston's silence. And because Alston's lawyer failed to object or to move to strike, the trial judge was never requested to give curative instructions. Nor did the trial judge give such instructions *sua sponte.* In short, we find reason to fear that the shortcomings of counsel infected the outcome of Alston's third trial, and for that reason, a writ of habeas corpus must issue, conditional on the results of a new trial.

V.

We hold that the denial of effective representation of counsel to George Alston was not harmless error, and that therefore the judgment of the district court must be reversed.

REVERSED.