Frank Durant **JEFFERS**, Petitioner,

v.

William D. **LEEKE**, Commissioner of SCDC, and Travis Medlock, Attorney General of South Carolina, Respondents.

Civ. A. No. 3:86–309–15J.

United States District Court,
D. South Carolina,
Columbia Division.

March 31, 1987.

ORDER

HAMILTON, District Judge.

The petitioner, a state prisoner, has filed the present action seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. The petitioner alleges that he received ineffective assistance of counsel at his state court trial. This matter is presently before the court upon respondents' motion for summary judgment filed March 27, 1986. Rule 56, Fed.R.Civ.Proc. The petitioner filed his opposition to the motion on May 5, 1986.[1] The matter was then referred to United States Magistrate Robert S. Carr, pursuant to 28 U.S.C. § 636(b)(1)(B) and this court's order of May 7, 1977. On August 14, 1986, Magistrate Carr issued his report and recommendation wherein he recommended that the respondents' motion for summary judgment be granted. The petitioner, through his attorney, James B. Richardson, Jr., Esquire, filed objections to the magistrate's report and recommendation on September 4, 1986. Pursuant to 28 U.S.C. § 636(b)(1)(C) the court must make a *de novo* determination of those portions of the magistrate's report and recommendation to which the petitioner has objected. *Camby v. Davis*, 718 F.2d 198 (4th Cir.1983). After reviewing the magistrate's report and recommendation, the petitioner's objection thereto and the applicable law, the court concludes that it cannot accept the magistrate's recommendation for the reasons which follow.

BACKGROUND

In October of 1981, the petitioner was convicted of murdering his wife and sentenced to life imprisonment. The petitioner was represented in his trial by H. Patterson McWhirter, Esquire, Public Defender for Lexington County. The petitioner's subsequent appeal to the South Carolina Supreme Court was affirmed in May of 1983. *State v. Jeffers*, Memo.Op. No. 83–MO–111 (Filed May 20, 1983). The petitioner then sought post-conviction relief in the

James B. Richardson, Jr., Columbia, S.C., for petitioner.

William A. Ready, III, Columbia, S.C., for respondents.

---

1. By order of April 1, 1986, the petitioner was fully advised of his right to oppose the motion for summary judgment. He was specifically advised of the consequences of his failure to oppose the motion. *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975).

state court alleging "Ineffective assistance of counsel prior to and during trial by failing to object to certain evidence offered, and certain trial errors committed by the court." In July of 1984, an evidentiary hearing regarding the matter was held in state court. The petitioner and his appointed counsel, Kellum Allen, Esquire, were present at the hearing and identified four matters as constituting "certain evidence" to which trial counsel should have objected.

The first portion of the transcript called to the court's attention involved the solicitor's direct examination of the investigating officer, Detective White, concerning his attempted interrogation of petitioner on the night of his arrest. The exchange was as follows:

Q: Did you have occasion to see him after he got back to the jail?

A: Yes, sir. It's normal procedure after a person has been booked in, if it's a case I've been assigned to, I get the person and bring 'em back down to my office and talk to 'em. I talked to him; I advised him of his rights; and he refused to talk to me and requested an attorney be present.

Q: Did you interrogate him any further?

A: No, sir. I turned him back to the jail sergeant.

Transcript, p. 65, 1.22—p. 66, 1.6.[2]

The second portion of the transcript called to the court's attention referenced cross-examination of Detective White, as follows:

Q: I believe Mr. DuTrimble asked you if Frankie ever told you it was an accident. Did he?

A: No, sir.

Q: But he did tell you that he didn't mean to hurt his wife?

A: Yes, sir.

Transcript, p. 70, 1.18–22.

The third portion of the transcript noted involved the re-cross-examination of Detective White:

Q: Did you ask him where he was going when he was wandering four blocks away?

A: When I talked to Frankie he indicated that he wanted an attorney.

Q: That was after awhile, but at first when you talked to him, he was just upset.

A: Yes, sir.

Transcript, p. 83, 1.14–20.

Finally, the petitioner noted a portion of the solicitor's closing argument in which the solicitor stated:

Then they took him back to the sheriff's department, booked 'im and when they tried to talk to 'im, what did Frank say? I want a lawyer. This is a man who was so distraught over his wife, who was incoherent with grief, out of his mind with misery, and he wants a lawyer right away. Was he so out of his mind that he doesn't know to ask for an attorney. He knows he's in trouble. Big trouble. He's sharp enough to ask for an attorney.

Transcript, p. 223, 1.17–23.

Subsequent to the evidentiary hearing, the Honorable Larry Patterson, Special Circuit Judge, issued a written order dismissing the petitioner's allegations as without merit. In his order, Judge Patterson found as a fact that trial counsel's failure to object to the introduction of the references to petitioner's request for counsel and post-arrest silence was a tacital decision. The petitioner subsequently sought and was denied a Writ of Certiorari from the South Carolina Supreme Court. The instant petition for habeas corpus followed that denial of certiorari.

After the parties submitted pleadings addressing the petition, Magistrate Carr issued his report and recommendation. He cited two primary grounds for recommending that the respondents' motion for summary judgment be granted. First, Magistrate Carr stated that "this court is bound by the state court's finding of historical

---

**2.** All transcript page references are derived from the April 11, 1986, appendix to the respon-

dents' motion for summary judgment.

fact that trial counsel's failure to object to comments concerning the petitioner's request for counsel was a tactical decision. 28 U.S.C. § 2254(d), *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). Accordingly, since the courts are reluctant to second guess tactics of trial lawyers this petition should be dismissed. *Goodson v. United States*, 564 F.2d 1071, 1072 (4th Cir.1977)." (Magistrate's Report and Recommendation, p. 8). While recommending that the petition be dismissed on the above ground, the magistrate conducted further review of the petition, "[B]ecause of the insidious nature of unchallenged prosecutorial exploitation of constitutionally protected post-arrest silence." *Id.* at p. 8. Magistrate Carr then applied the test for ineffective assistance of counsel found in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), and found that the petitioner was not denied the effective assistance of counsel. (Magistrate's Report and Recommendation pp. 9–11). On September 4, 1986, the petitioner, through his attorney, James B. Richardson, Jr., Esquire, filed objections to the magistrate's report and recommendation.

## PETITIONER'S OBJECTIONS

The petitioner's first objection is that the magistrate erred by accepting the state court's finding of fact, i.e., that trial counsel's failure to object to evidence of peti-

tioner's request for counsel constituted a tactical decision. The petitioner argues that trial counsel's explanation for his failure to object "fails to support a finding of a reasoned tactical decision by trial counsel." (Petitioner's Objections to Magistrate's Report and Recommendation, p. 1).

28 U.S.C. § 2254(d) requires federal courts in habeas proceedings to accord a presumption of correctness to state-court findings of fact ... The statute explicitly provides that 'a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... shall be presumed correct.' Only when one of seven specified factors is present or the state court finding 'is not fairly supported by the record' may the presumption be properly viewed as inapplicable or rebutted. *Sumner v. Mata*, 255 [455] U.S. 591, 591–592, 102 S.Ct. 1303, 1304 [71 L.Ed.2d 480] (1984). (footnotes omitted).

■■■ The court, having reviewed the entire record of the case and the state court evidentiary hearing of July 25, 1984, finds no reason to disagree with the state court's finding that trial counsel's failure to object to certain evidence [3] was a tactical decision.[4] However, merely denominating trial counsel's decision a trial tactic does not resolve the ineffectiveness of counsel claim because such a claim is a mixed question of law and fact.[5] *Strickland v. Wash-*

---

**3.** At the evidentiary hearing of July 25, 1984, the petitioner directed the court's attention to four portions of the transcript, p. 65, 1.22—p. 66, 1.6, p. 70, 1.18–22, p. 83, 1.14–20 and p. 223, 1.17–23. The court, having reviewed the petitioner's habeas corpus petition, the memorandum in opposition to the State's motion for summary judgment and the petitioner's objections to the magistrate's report, must conclude that the petitioner has abandoned his claim that trial counsel's failure to object to the introduction of evidence delinated on Transcript, p. 70, 1.18–22, constituted ineffective assistance of counsel. The court reaches this conclusion because the petitioner makes no reference to this evidence in any of the above referenced materials. This was confirmed in a telecon with petitioner's counsel, James B. Richardson, Jr., Esquire. Consequently, references to "certain evidence" contained in the dispositive portion of this order refer only to the evidence introduced at Tran-

script, p. 65, 1.22—p. 66, 1.6; p. 83, 1.14–20 and p. 223, 1.17–23.

**4.** Petitioner's second objection, i.e., that the magistrate erred by finding that trial counsel's failure to object to certain evidence was a tactical decision, is without merit. The magistrate made no independent finding of fact regarding this matter; rather, he accepted the state court's finding of fact.

**5.** Ordinarily, courts reviewing an ineffectiveness of counsel claim should not second guess strategic decisions of counsel. *Strickland*, 466 U.S. at 689–690, 104 S.Ct. at 2065–66. Additionally, the defendant, in pursuing his claim must overcome the presumption that the challenged actions of counsel might be considered *sound* trial strategy. *Id.* at 689, 104 S.Ct. at 2066. (emphasis added) However, counsel is not insulated from a finding that his performance was ineffective merely by classifying the challenged actions or

*ington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). Therefore, review of petitioner's remaining objections must take place in light of the standard for analyzing ineffectiveness of counsel claims articulated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* requires,

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.

Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders a result unreliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

In applying the above test the court must decide whether "there is a reasonable probability that, but for, counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■■■ *Strickland* does not proscribe a "bright-line" rule for determining the ineffectiveness of counsel, but rather, it makes clear that a case by case analysis, in light of the then existing circumstances, must take place. *Id.* at 690, 104 S.Ct. at 2068. [Therefore], a convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances,

the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690, 104 S.Ct. at 2066.

In view of the above, and with due regard for the admonition that, "judicial scrutiny of counsel's performance must be highly deferential", *Id.* at 689, 104 S.Ct. at 2065, the court finds that trial counsel's performance, in view of his failure to object to evidence heretofore delineated,[6] fell below an "objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2065.

## TRIAL COUNSEL'S ERRORS

■■■ In this case, trial counsel failed to object to references to petitioner's constitutional rights to silence and counsel.[7] The parties agree that Detective White's references to the petitioner's constitutional right to silence, Transcript, p. 66, 1.2–4, constituted a violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, respondents contend that the solicitor's reference to the petitioner's request for counsel is not a "technical" violation of *Doyle.* (State's Return, p. 8). While the court agrees that such a reference may not be a technical violation of *Doyle,* it is still violation of the petitioner's constitutional rights of the same magnitude as a *Doyle* violation. As *Miranda* makes clear, a defendant is afforded the right to silence in order to protect his privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 472, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694

---

inactions as trial strategy. Hoots v. Allsbrook, *785 F.2d 1214, 1219–1220 (4th Cir.1985).*

**6.** See footnote 3.

**7.** The petitioner, in his objections, alleges that each such reference constitutes a violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).

(1966). In order to protect the privilege against self-incrimination, defendants are afforded the constitutional right to counsel. *Id.* Therefore, the right to counsel and the right to silence are rights of equal constitutional significance. Consequently, respondents' contention, that reference to the petitioner's request for counsel is somehow a lesser violation of the petitioner's constitutional right, is without merit. Finally, respondents argue that the reference to the petitioner's invocation of his right to counsel, (Transcript, p. 83, 1.14–20), is merely "reference to statements made by the petitioner [and] did not violate his constitutional rights under *Doyle v. Ohio.*" (State's Return, p. 7). The court agrees that the response did not directly reference petitioner's right to silence under *Miranda* and *Doyle.* *Doyle,* addressed the situation wherein the prosecutor uses evidence of the defendant's post-arrest silence against him. *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, as was made clear in *Alston v. Garrison,* 720 F.2d 812, 814, 815 (4th Cir.1983), *Doyle* error can occur during cross examination by defense counsel. In *Alston,* the defense counsel, during cross examination of the investigating detective (Burns), elicited the following response:

> Mr. Alston started to talk after I read him his constitutional rights, and then he stood on his rights. He shut up. He said I want a lawyer. Right away, I respected his wishes. *Id.* at 815.

The court found a *Doyle* error occurred in this instance. This court finds the statement by Detective White, "When I talked to Frankie he indicated he wanted an attorney", (Transcript, p. 83, 1.16–17), markedly similar to the statement of Detective Burns in *Alston.* However, because there is not a direct reference to the petitioner's silence, the court cannot clearly categorize this statement as a *Doyle,* error. Nevertheless, even if Detective White's statement is not a *per se* violation of *Doyle,* it was an unconstitutional violation of the petitioner's

rights equal in magnitude to a *Doyle,* error.[8]

Given that the petitioner's constitutional rights were violated three times, by the introduction of certain evidence the court must decide whether trial counsel's failure to object to such evidence constituted ineffective assistance of counsel.

## TRIAL COUNSEL WAS INEFFECTIVE

Few mistakes by criminal defense counsel are so grave as the failure to protest evidence that the defendant exercised his right to remain silent. See *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir.1980). Such evidence plants in the mind of the jury the dark suspicion that the defendant had something to hide, and that any alibi which is subsequently proffered is pure fabrication. The Supreme Court best stated these concerns in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), holding that comment on a defendant's post-arrest silence violated due process of law:

> The warnings mandated by [*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966),] ... contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. *Id.* at 426 U.S. at 617–18, 96 S.Ct. at 2244–45 (citations and footnotes omitted). *Alston v. Garrison,* 720 F.2d 812, 816 (4th Cir. 1983), *cert. denied* 468 U.S. 1219, 104 S.Ct. 3589 [82 L.Ed.2d 886] (1984).

As noted, the parties agree that the reference to petitioner's post-arrest silence, Transcript, p. 65, 1.22—p. 66, 1.6, was a clear *Doyle* violation. Consequently, the

---

**8.** The court reaches this conclusion for the reasons discussed at pages 683–684 of this order. Additionally, the court notes that the only reasonable inference to be drawn from Detective White's statement, given its context, is that the petitioner stood on his constitutional right to remain silent.

concerns expressed above are directly applicable in the present case. Additionally, for reasons previously stated, the damage done by the solicitor's reference to the defendant's invocation of his right to counsel, (Transcript, p. 83, 1.16–17 and p. 223, 1.17–23), raises similar concerns to those expressed in *Doyle*. These concerns are particularly relevant in the case at hand because the petitioner admitted killing his wife, but alleged that the killing was an accident. Therefore, the only issue before the jury was defendant's intent. The argument of the solicitor directly addressed this issue and can reasonably be interpreted to infer that the defendant had the requisite intent to commit murder. Transcript, p. 223, 1.17–23. The solicitor obviously drew upon the earlier reference to defendant's request for counsel in making this argument. Transcript, p. 83, 1.16–17.

In *Alston v. Garrison*, 720 F.2d 812 (4th Cir.1983), the court was presented with an ineffectiveness of counsel claim on facts relatively similar to this case. Three unobjected to references were made to the defendant's invocation of his *Miranda* rights. The first reference occurred on direct examination of the investigating detective by the North Carolina prosecutor, wherein the following colloquy took place:

Q: After advising him of his constitutional rights did you talk with him at all?

A: Well, sir, he stood on his constitutional rights.

Q: In other words, he didn't say anything to you at that time, did he?

A: He started to converse, sir, and then he just shut up and he said I want my lawyer and we abided by his wishes.

*Id.* at 815.

The second reference occurred during cross-examination of the same detective by the defendant's counsel.

In cross-examination of Detective Burns, Alston's lawyer asked what had prompted the police to designate Alston as the chief suspect in the case. Burns gave four reasons:

. . . . .

(4) he did not give any statement concerning—I would say his activities on the date of the 30th of December, 1976. As I stated, he stood on his constitutional rights. (emphasis in original deleted) *Id.*

The final reference occurred later during the same cross-examination when Detective Burns, the investigating detective, described his encounter with the defendant as follows: "Mr. Alston started to talk after I read him his constitutional rights, and then he stood on his rights. He shut up. He said I want a lawyer. Right away, I respected his wishes." *Id.*

The court held that, given the seriousness of any reference to post-arrest silence, trial counsel's performance was undisputedly incompetent, and that the defendant was denied the effective assistance of counsel. *Id.* at 816. Additionally, in *Alston* the prosecutor did not capitalize upon inadmissible evidence in his closing argument. Obviously, emphasizing such evidence in closing argument, as in this case, serves only to magnify the error and increase the need for defense counsel to object. *Passman v. Blackburn*, 797 F.2d 1335, 1347 (5th Cir. 1986). Therefore, given the apparent similarities between this case and *Alston*, it would appear mandated to conclude that trial counsel's performance was ineffective. However, in the instant case, trial counsel asserts that his failure to object to the previously delineated evidence was a matter of trial strategy. In gist, trial counsel's strategy was:

[T]o have as little confusion as possible and try to look like we were not trying to hide anything and that we were open and honest because it was a major part of our defense that Frankie loved his wife and regretted that this thing occurred which I hoped and thought that the jury would believe. So we wanted to go as smoothly as possible. Transcript, p. 278, 1.8; *see also* p. 278, 1.20—p. 279, 1.2 and p. 280, 1.8—p. 281, 1.1.

*Alston* did not address what, if any, role trial strategy considerations play in the analysis of an ineffective assistance of counsel claim. However, the United States Supreme Court in *Strickland* stated:

Judicial scrutiny of counsel's performance must be highly deferential ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered *sound* trial strategy.' *See Michel v. Louisiana, supra,* [350 U.S. 91] at 101 [76 S.Ct. 158, 100 L.Ed. 83 (1955)]. *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (emphasis added).

Having reviewed the entire record in this case, the court finds that trial counsel's failures to object to certain evidence cannot be considered sound trial strategy. Initially, the court notes that trial counsel interposed objections in this case on issues of considerably lesser constitutional significance. *See,* e.g., Transcript, p. 52, 1.23—p. 53, 1.6 (objection to reference to prior arrest), p. 114, 1.24–25 (objection to witness' speculation as to the storage location of a shotgun). Transcript, p. 160, 1.13–14 (objection to improper impeachment).

Additionally, on occasion, the jury was excused, at the defendant's request, in order to take up potentially damaging matters, thereby further breaking up the "smoothness of the trial". *See,* e.g. Transcript, p. 85, 1.8–9, and p. 156, 1.21–22.

Finally, trial counsel asserted that he failed to object to the solicitor's closing argument because, "It had all been brought out in the case." Transcript, p. 280, 1.17–18. He, also, stated that "The statement [of the solicitor] was consistent with the testimony that came out in the trial although it's exaggerated, and that's part of his job." Transcript, p. 280, 1.24—p. 281, 1.1. The above reasons do not satisfactorily explain the failure to object to the solicitor's closing argument, and cannot reasonably be ascribed to a sound trial strategy. The solicitor's argument changed the patently neutral nature of the comments at Transcript, p. 65, 1.22—p. 66, 1.6, and p. 83, 1.14–20 and transformed them into inferences of the defendant's guilt. Given these circumstances, it is inconceivable that trial counsel's failure to object could be attributed to a *sound* trial strategy. Therefore, in light of the inconsistent manner in which trial counsel employed his asserted trial strategy and based upon the previously cited authorities, the court is constrained to conclude that trial counsel's "representation fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Consequently, the petitioner was denied the effective assistance of counsel.[9]

## THE PETITIONER WAS PREJUDICED BY TRIAL COUNSEL'S ERROR

Having determined that the petitioner was denied the effective assistance of counsel, the court now addresses whether counsel's "deficient performance prejudiced the defendant." *Id.* at 687, 104 S.Ct. at 2064. To prevail on his claim of prejudice the petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. The

---

9. Both parties have suggested that the constitutional errors which have occurred in this case should be analyzed under the "harmless beyond a reasonable doubt" standard of *United States v. Hasting,* 461 U.S. 499, 510–511, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983). The petitioner, in his objections, also argues that the court should apply the "five point analysis set forth in *Williams v. Zahradnick,* 632 F.2d 353 (4th Cir. 1980), in determining whether the *Doyle* error was harmless." (Petitioner's objection to the Magistrate's Report and Recommendation p. 2). The court has not elaborated upon this analysis; however, for the reasons which follow in the body of this order, it is clear that the constitutional errors which occurred in this case were not harmless beyond a reasonable doubt.

court must decide whether there is a "reasonable probability that absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Strickland, Id.* at 695, 104 S.Ct. at 2069. In making this determination the court must evaluate the totality of the evidence before the jury. *Id.*

With the above guidelines for evaluating prejudice, the court now turns to the case at hand. The petitioner was convicted of murder. He admitted shooting his wife with his shotgun; however, he argued that the shooting was an accident. Transcript, p. 149, 1.4–10. Petitioner's version of the facts leading up to the shooting is as follows: He was a loving husband and father who was living with his in-laws in an effort to save money for a place of his own. Transcript, p. 129–134. During the morning and early afternoon hours of March 8, 1981, the petitioner, his wife and infant daughter visited various friends and relatives. Transcript, p. 140–143. During this period, the petitioner smoked some marijuana and drank a significant amount of alcohol. Transcript, p. 142, 1.10–11, p. 142, 1.25—p. 143, 1.1. The petitioner and his family then returned home and he went into his bedroom to listen to music. Transcript, p. 146, 1.12. Shortly thereafter, the petitioner increased the volume of his stereo in order to overcome television noise from the adjoining room. Transcript, p. 146, 1.14–15. He then overheard his father-in-law "[T]ell Tammie [petitioner's wife] to come in there and tell me [petitioner] to cut the goddam stereo down or he'd bust it up." Transcript, p. 146, 1.21–22.[10] At this point, the petitioner went to the bedroom closet and took out his single-shot shotgun. Transcript, p. 147, 1.16. He then loaded the shotgun with a shell that was "just layin' aroung (sic)." Transcript, p. 164, 1.21. The petitioner then placed the gun on the bed. His wife entered the room, holding the baby, and the petitioner then picked up the gun and cocked it. Transcript, p. 167, 1.23. His wife asked him what he was going to do with that gun, and the petitioner replied he wanted his father-in-law to come in and do what he said he was going to do. Transcript, p. 165, 1.2–5. The petitioner then "made a sudden movement ... kind of a twitch." Transcript, p. 167, 1.13–15. His wife screamed, "No, Frankie, no, don't". The petitioner then tried to unbreech the gun and "the gun slipped off and hit the bed and went off." Transcript, p. 149, 1.4–5, p. 167, 1.17. The petitioner stated the gun was not pointed in a safe direction because he was drunk. Transcript, p. 168, 1.14. The petitioner's father-in-law then entered the room and told the petitioner he "better get outa' there." Transcript, p. 149, 1.24–25. The petitioner then ran from the house to seek help for his wife.[11] Transcript, p. 150, 1.1–3.

If the petitioner's story is believed, it would have been reasonable for the jury to conclude that the shooting of the petitioner's wife was an accident. However, "Respondents contend that the quantum of other evidence indicative of guilt was overwhelming, that Petitioner's exculpatory story was totally implausible and that it is clear beyond a reasonable doubt that the jury would have returned a verdict of guilty absent evidence of Petitioner's silence. *A complete and thorough reading of the transcript* indicates that Petitioner's defense of accident was totally implausible. Petitioner's statements contained numerous discrepancies and contradictions and his actions and statements prior to and after the homicide further indicate overwhelming guilt beyond a reasonable doubt."[12] Respondents' Return, p. 11 (emphasis added).

---

**10.** The petitioner's wife had, at the request of her father, previously asked the petitioner to lower the volume of the music.

**11.** The baby was not injured in the shooting.

**12.** Respondents assert that the petitioner's statement of the facts contains "numerous discrepancies and contradictions." However, respon- dents have neither referenced nor delineated these alleged discrepancies and contradictions for the court's review. *But see,* Magistrate's Report and Recommendation, p. 10 "[The petitioner's] testimony contradicts testimony from the state *only* with regard to whether the petitioner and his wife had recently fought." (emphasis added)

The court has conducted a "complete and thorough reading of the transcript" and cannot agree with the respondents' conclusion. As has been previously stated, the petitioner admitted shooting his wife, however, he contended that the shooting was an accident. Under these circumstances, and as regards the charge of murder, the only issue before the jury was whether or not the petitioner acted with malice aforethought.[13] S.C.Code Ann. § 16–3–10 (Law. Co–Op 1976). The solicitor's argument went directly to this issue and unambiguously inferred that the petitioner's invocation of his constitutional rights was indicative of his criminal intent. Transcript, p. 223, 1.17–23. Trial counsel's failure to object under these circumstances was clearly error. However, "Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, at 695–696, 104 S.Ct. at 2069.

For the reasons which follow, the court concludes that trial counsel's errors had a pervasive effect on the inferences to be drawn from the evidence and significantly altered the evidentiary picture.

Obviously, the petitioner's intent was an element of the crime which could be proved only by circumstantial evidence. The significant items of evidence which may have indicated that the petitioner acted with malice aforethought were as follows:[14] Three (3) witnesses testified that before the petitioner's wife was shot she screamed "No, Frankie, no, don't do it." Transcript, p. 110, 1.12, (Beth Wells, decedent's sister), p. 112, 1.16 (Mrs. Wells, decedent's mother), p. 116, 1.6–7 (Mr. Wells, decedent's father).[15] Additionally, the state offered evidence tending to show that the petitioner and his wife had an argument on the day of the shooting. Transcript, p. 204, 1.5–13. Also, Dan De Freese, a firearms expert with the South Carolina Law Enforcement Division, testified that in his opinion, "within this class of weapon, this is a very, ah, safe weapon. It does operate in the way it's intended and it's obvious the manufacturer had safety in mind when he designed it because this gun does tend to correct a number of faults which have occurred with older single barrel shotguns." Transcript, p. 108, 1.19–23. Mr. De Freese also stated that he did not think, even assuming the gun was cocked, that there was a chance "you could slip off the safety and hit the trigger". Transcript, p. 108, 1.2–4.

During trial, the petitioner asserted that his reason for getting the shotgun was to scare his father-in-law, who had threatened to bust up his (the petitioner's) stereo. Transcript, p. 165, 1.14. However, the petitioner could offer no reason why this avowed purpose also required the loading and cocking of the shotgun. Transcript, p. 165, 1.11–18, p. 167, 1.24—p. 168, 1.3.[16]

Finally, Mr. Wells testified that when he entered the bedroom in response to the shotgun firing, "He [the petitioner] threw down the gun, pushed me out of the way and jumped over Tammie [the decedent] and ran for outside." Transcript, p. 116, 1.23–25. This evidence was most likely offered to show that the petitioner's first instinct was to flee the shooting scene.

However, the petitioner countered the state's evidence with evidence which tended to support his accidental shooting theory. The petitioner stated that his wife screamed, "No, Frankie, no, don't." in re-

---

**13.** For the sake of brevity further discussion of this issue will reference the petitioner's intent.

**14.** The listing of these evidentiary items should not be construed to imply that the entire record has not been considered by the court. The record of this case has been laboriously reviewed. However, because the respondents will undoubtedly point out evidence which they believe the court has failed to consider, the court desires to make it clear that the evidence delineated was not the only evidence considered by the court. These items are, however, representative of the nature of the evidence presented in the case and tended to be the dominate areas of the trial.

**15.** The petitioner's testimony differed slightly in that he states his wife screamed, "No, Frankie, no don't." Transcript, p. 149, 1.4.

**16.** The inferences to be drawn from this item of evidence could easily support a conviction for involuntary manslaughter or murder. They are in no way dispositive of this case.

sponse to a sudden movement he made with the gun. Transcript, p. 149, 1.2–4 and p. 167, 1.13–15. This assertion was neither incredible nor unrealistic considering that the petitioner was drunk and handling a loaded and cocked shotgun.

The state's evidence that the petitioner and his wife had been arguing on the morning of the shooting was derived from the testimony of Beth Wells. Ms. Wells, the decedent's sister, related the following conversation between herself and Mrs. Ross Brazell: [17]

Q. What did y'all talk about?

A. I asked her, I said, Mrs. Brazell, do you have any idea what happened while they were out here at your home? She said they were drinking and Tammie drank a little. She said Frankie was drinking quite heavily and Tammie got onto him about the drinking so heavily and Frankig (sic) told her just to go away and mind her own business. There was another time, she said, that Frankie and John were arguing and Tammie told Frankie that a family reunion type thing wasn't the place to have an argument, that they could take it elsewhere. Frankie told her again to go away and mind her own business and to leave him alone.[18]

Transcript, p. 204, 1.4–13.

However, Mrs. Brazell denied making the above statements to Ms. Wells [19] and stated that the petitioner and his wife "got along wonderful over there at my house"

and that she had not heard any argument. Transcript, p. 206, 1.5–8. Finally, Mr. Haskell Jeffords, the petitioner's father, testified that, "She [the petitioner's wife] mentioned one time that he [the petitioner] had too many and he said, well, you're drinking, too. Wasn't an argument." Transcript, p. 208, 1.13–14. The petitioner denied that any argument had occurred that day. Transcript, p. 144, 1.19–24. Obviously, the evidence was in conflict as to the characterization of any conversation which may have occurred at Mrs. Brazell's house between the petitioner and his wife. However, in light of human experience, it would be a strained conclusion to infer from the trial testimony that the petitioner shot his wife because she told him he was drinking too much.

The testimony of Dan De Freese, the firearms expert, was also capable of diverse inferences. Mr. De Freese's heretofore cited testimony was unfavorable to the petitioner. However, despite a lengthy direct-examination by the solicitor, Mr. De Freese did not rule out the possibility that the gun discharged in the manner which the petitioner stated.[20]

Finally, as regards the petitioner running from the Wells's home immediately after the shooting, the petitioner stated that he did so because of Mr. Wells's admonition to "get outa' there". Transcript, p. 149, 1.24–25. The petitioner stated he then ran from the house to seek help for his wife. Transcript, p. 150, 1.1–3. As the Wells's home did not have a telephone, this action would

---

**17.** The March 8, 1981 family reunion was held at Mrs. Brazell's home. The shooting occurred later that day.

**18.** This conversation allegedly took place on March 9, 1981.

**19.** Ms. Wells was also impeached when she admitted that she hated the petitioner. Transcript, p. 204, 1.21.

**20.** The petitioner had stated that he was trying to unbreech the gun when it "slipped off and hit the bed and went off." Transcript, p. 149, 1.4–5. Although the record is somewhat ambiguous, it appears defense counsel was addressing this theory at Transcript, p. 107, 1.10–18, wherein the following exchange took place:

Q. If you cock this shotgun back like this and neglect to undo it before you try to breech it, it won't breech, will it?
A. To the best of knowledge, it will not. When the weapon is fully cocked, it will not unbreech.
Q. No matter how hard you pull, it's not go breech.
A. Evidently, the gun is designed so that it will not unbreech.
Q. But if your finger comes off of that and hits the trigger, it'll go off.
A. Given the circumstance that you have, obviously, that will happen.
While the above colloquy does not clearly substantiate the petitioner's theory, it does tend to show that it is not beyond belief or the realm of possibility.

not have been unreasonable under the circumstances. Transcript, p. 169, 1.12–14.

Notwithstanding the apparent equipoise of the inferences which can be drawn from these facts, the respondents contend that the evidence of the petitioner's guilt was overwhelming. However, the petitioner's action immediately after the shooting tended to substantiate his accidental shooting theory. Immediately after the shooting, the petitioner stated that he did not mean to do it and that he should have a bullet put through his head. Transcript, p. 112, 1.18–19; p. 54, 1.16–21. *See*, also, Transcript, p. 30, 1.2–4, p. 31, 1.8–18. Additionally, the petitioner argued, as further evidence that the shooting was an accident, that he flagged down an ambulance and directed it to the shooting scene, that he fought his father-in-law to get back into the Wells's home to aid his wife and that he fought policemen to see his wife at the Lexington County Hospital, where she was being treated for the shotgun wound. Transcript, p. 151, 1.7–11, p. 170, 1.6–25, p. 152, 1.5–13.

In light of all of the above, it is obvious that this was a very close case for the jury to decide. Indeed, it is this very closeness which compels the court to conclude that the petitioner was prejudiced by trial counsel's ineffectiveness. The facts of the case were relatively undisputed and the case turned on the inferences to be drawn from these evidentiary facts. Regarding the charge of murder, the only issue before the jury was whether the petitioner acted with malice aforethought. As *Strickland* states, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland* at 696, 104 S.Ct. at 2069.

Additionally, the errors in this case went directly and pervasively to the inferences to be drawn from the trial evidence. *Id.* at 695–696, 104 S.Ct. at 2069. More importantly, they went *directly* to the sole issue in the case, the petitioner's intent at the time he shot his wife. Under these circumstances, the court concludes that there is a reasonable possibility that but for trial

counsel's unprofessional errors the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. Unquestionably, the court's confidence in the outcome of this verdict is undermined. For the foregoing reasons, the court cannot accept or adopt the recommendation of the United States Magistrate in this instance.

Therefore, the court orders that the petitioner's writ of habeas corpus be granted and that the state discharge him within seventy-five (75) days of the filing of this order unless it decides to retry the petitioner within that period.